Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 16, 2003      Decided October 28, 2003

No. 02-5265

LeBoeuf, Lamb, Greene & MacRae, L.L.P.,
APPELLANT

v.

Spencer Abraham, Secretary,
United States Department of Energy and
Department of Energy,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00269)

———

*James L. Feldesman* argued the cause for appellant. With him on the briefs were *Eugene R. Fidell*, *Kathy S. Ghiladi*, *David G. Hetzel*, *Michael F. McBride*, *John W. Lawrence*, and *R. Kenly Webster*.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Harold D. Lester, Jr.*, Assistant Director, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *David M. Cohen*, Director. *Kenneth S. Kessler*, *Monica J. Palko*, and *Peter D. Keisler*, Attorneys, U.S. Department of Justice, entered appearances.

Before: SENTELLE, ROGERS, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The law partnership of LeBoeuf, Lamb, Greene & MacRae, L.L.P. ("LeBoeuf") appeals the denial of its request for a direct award of a government contract and the grant of summary judgment to the Department of Energy. LeBoeuf protested the Department's award of a contract for outside legal services to another law firm and now contends that the district court erred in finding that its award request was moot and in granting summary judgment in view of a material issue of disputed fact as to whether the Department complied with procurement regulations. We vacate the judgment and remand the case to the district court to determine (1) whether the Department adequately considered the apparent conflict of interest as required by federal and Departmental regulations, and (2) whether the Department's need for expert legal services on the Yucca Mountain Project can support a direct award of the contract to LeBoeuf or an award of other relief.

I.

Three contracts are relevant to this appeal. All of the contracts relate to the Department's plans to obtain an operating license from the United States Nuclear Regulatory Commission ("NRC") for the Yucca Mountain Nuclear Waste Repository site in Nevada ("Yucca Mountain Project"). *See* Nuclear Waste Policy Act of 1982 (codified as amended at 42 U.S.C. §§ 10101–10270 (1987)). Under the Act, the Department must issue guidelines for the recommendation of sites for a permanent repository, nominate sites for site characterization to be approved or disapproved by the President, and once a site is chosen, seek a license from the NRC to construct and operate the repository. *Id.* §§ 10132–10145.

The first contract was entered into by the Department in 1991 with TRW Environmental Safety Systems, Inc. ("TRW"). Under the TRW Contract, TRW was the management and operations contractor for the Yucca Mountain Project. In that capacity, TRW was to conduct studies to determine the suitability of the site as a repository, and thereby assist the Office of Civilian Radioactive Waste Management ("OCRWM") in developing an integrated radioactive waste management system for the storage and ultimate disposal of spent nuclear fuel and high-level radioactive waste in a manner that protects public health and safety and the environment. *See id.* § 10134.

The second contract, a subcontract, was entered into by TRW in 1992 with the law firm of Winston & Strawn ("Winston"). Under the TRW Subcontract, Winston was to provide expert legal services to ensure that TRW performed in accordance with NRC regulations and guidelines. Winston's statement of work covered both consulting services and legal advice and counseling. TRW's request for proposals ("RFP") stated that to be eligible, a contractor had to make a "[c]ommitment not to engage in activities that would appear to or actually conflict with the interests of TRW."

The third contract—the Yucca Mountain contract—stemmed from a RFP issued by the Department on May 27, 1999. Because its Office of General Counsel ("OGC") lacked the relevant expertise, the Department sought expert legal counsel to provide "professional legal advice and assistance" to the OGC "involving matters related to the licensing activities" of the OCRWM for the Yucca Mountain Project. The scope of work potentially involved review of work performed by Winston for TRW under the TRW Subcontract. The RFP required that bidders be qualified and eligible under applicable laws and regulations and to disclose any conflicts of interest. Additionally, the RFP required that bidders have special NRC expertise and that attorneys chosen to work on the Yucca Mountain Project be active members of at least one State bar. The RFP was based on a ten-year period of performance.

Prior to awarding the Yucca Mountain contract, the Department recognized the importance of avoiding the appearance of a conflict of interest in hiring expert counsel. The Department created a special conflict of interest provision disqualifying law firms that, within the preceding five years, had represented a party against the Department in litigation relating to the "Standard Contract For Disposal of Spent Nuclear Fuel And/Or High–Level Radioactive Waste." 10 C.F.R. § 961.11. In that connection, the Department recognized that it was statutorily obligated to serve a broader public interest than an interested party. The Head of Contracting Activity in the Office of Headquarters Procurement Services ("HCA") stated in his decision of July 30, 1999 denying the protest of a law firm as a potential bidder on the 1999 RFP, that notwithstanding the fact that "utilities and [the Department] both have an interest in having the license issued quickly," under the Nuclear Waste Policy Act, the Department "serves a broader interest of protecting the environment and public health." *See* 42 U.S.C. § 10131(a)(4), (5). In other words, the Department's statutory responsibilities might require action that a utility would oppose, such as, for example, a Department decision imposing stricter controls that would increase the utility's operating costs. The HCA observed that "[t]his difference is the source of the divergence in interests . . . that gives rise to the various potential conflicts of interest," which "cannot be mitigated simply by imposing a firewall [within the law firm] for the protection of [the Department's] confidential information." Protest Decision of July 30, 1999 at 5.

Only two law firms, LeBoeuf and Winston, submitted bids. Pursuant to the conflicts disclosure requirement of the Department's Acquisition Regulations ("*DEAR*"), *see* § 952.209–8, 48 C.F.R. § 952.209–8, Winston stated that "[n]o actual or potential conflict of interest or unfair competitive advantage exists under the TRW Subcontract." Based on the information provided by Winston, a technical advisory committee and the contracting officer concluded that Winston's prior work for TRW did not present an organizational conflict of interest barring its award of the contract. The Department an-

nounced the award to Winston, as the low bidder by over $3.6 million, in September 1999. The contract was for a five-year term, renewable in segments for a total of ten years.

LeBoeuf filed an administrative appeal alleging that Winston had an organizational conflict of interest ("OCI"). The Department denied the appeal, stating that the Yucca Mountain contract was a replacement for the TRW Subcontract and the statement of work was substantially similar to the statement of work under the TRW Subcontract. Subsequently, the General Accounting Office ("GAO"), by decision of February 3, 2000, denied LeBoeuf's bid protest. GAO concluded that Winston did not have a conflict of interests in light of the Department's Revised Management Plan for the development of the licensing application designating the OGC, and not Winston, as the entity to provide "concurrence review" before the application was filed with the NRC. "Concurrence review," which was part of the Department's quality assurance review, involved review of the license application to assure conformance with NRC laws and regulations, which, given OGC's lack of expertise, LeBoeuf claimed would have to be performed by Winston, creating a conflict of interests. However, GAO found that Winston did not have a disqualifying OCI because the Department was ultimately responsible for review of the licensing application and the Yucca Mountain contract involved a continuation of work that Winston had performed under the TRW Subcontract.

In March 2000, LeBoeuf filed suit against the Department in the federal court in Nevada for declaratory and injunctive relief; that court transferred the case to this district in January 2001. In its complaint, LeBoeuf alleged that the Department acted arbitrarily and capriciously and contrary to its own regulations in awarding the Yucca Mountain contract to Winston because Winston had a disqualifying conflict of interest stemming from the TRW Subcontract. LeBoeuf requested that the district court directly award it the balance of the work remaining under the Yucca Mountain contract, along with its bid proposal and preparation costs.

Winston provided legal services to the Department for two years under the Yucca Mountain contract, until November 29, 2001. At that time, Winston and the Department mutually agreed to cancel the contract. Only a few weeks before, a November 13, 2001 report of the Department's Inspector General concluded that Winston had violated the OCI provision of the contract by failing to disclose its lobbying and non-lobbying activities for the Nuclear Energy Institute, a nuclear industry trade group whose members include commercial utilities that would send spent nuclear waste to the Yucca Mountain site. Following the termination of the Yucca Mountain contract, the parties filed cross-motions for summary judgment.

The district court denied LeBoeuf relief. It ruled that LeBoeuf's request for a direct award of the Yucca Mountain contract was moot because the contract had been terminated in November 2001 and any new RFP for expert legal services would be for different services in view of the work done by Winston. The court granted the Department's motion for summary judgment, concluding that it had adequately examined Winston's potential conflict of interests, that the Nevada Code of Professional Conduct did not fall within the Federal Acquisition Regulations's reference to "applicable law and regulations," and that LeBoeuf had failed to show that the Department acted in bad faith in awarding the contract to Winston.

## II.

LeBoeuf's position before the Department, GAO, and the district court was that Winston was barred from being awarded the Yucca Mountain contract under federal and Department procurement regulations, applicable state bar rules, and the terms of its earlier commitments to TRW, whose interests in the approaching NRC licensing proceeding were, according to LeBoeuf, "virtually certain to be adverse to the [Department's interests]." Appellant's Brief at 10. On appeal, LeBoeuf renews its position, contending that the district court erred in granting summary judgment where the Department merely accepted at face value Winston's no-conflicts assertion and failed to take into account any of the factors that disquali-

fied Winston. LeBoeuf also contends that the district court erred in ruling that LeBoeuf's request for a direct award of the contract was moot inasmuch as the court was unable to determine on the basis of the record that the Department would not employ expert counsel to complete work that Winston had begun, failed to grant LeBoeuf a reasonable opportunity to probe and dispute the Department's claims that it would not use substitute expert counsel, and disregarded the material issue of fact on that issue presented by LeBoeuf.

"The court's role in reviewing agency contract decisions is limited to determining whether the agency acted in accord with applicable statutes and regulations and had a rational basis for its decisions*." Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984). As with other agency cases, our review is limited to the administrative record, 28 U.S.C. § 1491(b), 5 U.S.C. § 706 (1964 ed., Supp. V), and the agency is entitled to a presumption of regularity. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105 (1977). The Supreme Court has cautioned reviewing courts against imposing their own views of proper procedures upon agencies and "improperly intrud[ing] into the agency's decisionmaking process," *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 525 (1978), an approach that has been deemed particularly warranted in the area of government procurement contracts. *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1270 (5th Cir. 1978). As this court has noted, because agency procurement decisions implicate the agency's "technical expertise," the court's review is highly deferential. *Multimax, Inc. v. Fed. Aviation Admin.*, 231 F.3d 882 (D.C. Cir. 2000). *See also Iceland S.S. Co., Ltd.-Eimskip v. United States Dept. of the Army*, 201 F.3d 451, 461 (D.C. Cir. 2000). Thus, courts will not make contracts for agencies, for the ultimate grant of a contract must be left to the discretion of the agency, "unless it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award." *Delta Data,* 744 F.2d at 204.

Consequently, the disappointed bidder seeking to overturn the agency's decision must show either that the agency's decision lacked a rational basis or that the "procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973).

The court's review of the district court's grant of summary judgment to the Department is *de novo*, *see Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Our review of LeBoeuf's procurement challenge pursuant to 28 U.S.C. § 1491(b)(4), which incorporates the standards of 5 U.S.C. § 706(2), *see Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000), focuses first, on the contracting officer's obligations under federal and Departmental regulations to identify and evaluate potential conflicts of interest, and second, on the question of mootness in light of the Department's continuing need for expert legal services for the Yucca Mountain Project.

## A.

Under the Competition in Contracting Act, 41 U.S.C. § 253b(a), bids in response to a RFP must be evaluated in accordance with the RFP and applicable procurement regulations—the Federal Acquisition Regulations ("*FAR*") and the Department's Acquisition Regulations ("*DEAR*"). As relevant, *FAR* § 9–504(a)(1), 48 C.F.R. § 9.504(a)(1), requires an agency to analyze a planned procurement to identify and determine any possible organizational conflict of interests ("OCI"). The contracting officer must seek to "[a]void, neutralize, or mitigate significant potential conflicts" before awarding a contract. *Id.* § 9.504(a)(2). A contract shall be awarded to a successful offeror "unless a conflict of interest is determined to exist that cannot be avoided or mitigated." *Id.* § 9.504(e). Further, the *FAR* provides that when identifying and evaluating a potential OCI, the agency should first "seek the information from within the Government or from other readily available sources," including "the files and the knowledge of personnel within the contracting office. . . ." *Id.*

§ 9.506(a). Under *FAR* § 9.105–1(a), special responsibilities are placed on the contracting officer "[b]efore making a determination of responsibility ... [to] possess or obtain information sufficient to be satisfied that a prospective contractor currently meets the applicable standards in 9.104." "When it is necessary ... the contracting officer shall develop, with the assistance of appropriate specialists, special standards of responsibility." *Id.* § 9.104–2(a).

These requirements are reflected in the Department's procurement regulations on organizational conflicts of interest. *See DEAR* § 952.209–8. The regulations provide that an OCI exists when a contractor "is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired." *Id.* § 952.209–8(a). The *DEAR* also require the apparent successful bidder to provide a detailed statement regarding possible conflicts of interest arising as a result of "any past (within the past twelve months), present, or currently planned financial, contractual, organizational, or other interests relating to the performance of the statement of work." *DEAR* § 952.209–8(c)(1). In describing the level of detail to be contained in this statement, the regulations state that as to "these and any other interests enough such information must be provided to allow a meaningful evaluation of the potential effect of the interest on the performance of the statement of work." *Id.*

The evidence of Winston's apparent conflict of interests appears in the language of the TRW Subcontract and the 1999 RFP for the Yucca Mountain contract. The TRW Subcontract bound Winston to provide services exclusively to TRW and not to act in a manner contrary to its interests. Both the TRW Subcontract and the 1999 RFP included the *DEAR*'s OCI provision, *see id.* § 952.209–72, and the 1999 RFP also incorporated an OCI disclosure requirement, *see id.* § 952.209–8. The OCI provision is, by its terms, designed to ensure that the contractor is not biased as a result of other contractual, organizational, financial, and other interests relating to work under the contract and to avoid any unfair competitive advantage. *See id.* § 952.209–72(a). The OCI

provision bars a contractor from participating "in any capacity in Department contracts, subcontracts, or proposals . . . which stem directly from the contractor's performance of work under this contract for a period of . . . years [to be set by the contracting officer] after the completion of this contract." *Id*. § 952.209–72(b)(1)(I). An exception provides that "[n]othing in this subparagraph shall preclude the contractor from competing for follow-on contracts for advisory and assistance services." *Id*.

The Department insists that there was no conflict of interests when it selected Winston because the 1999 RFP contemplated a "follow-on" contract to the TRW Subcontract. The record suggests two possible grounds for this conclusion. First, under the 1991 TRW Contract, TRW was the Department's "prime" contractor on the Yucca Mountain Project, performing various site characterization studies to determine if Yucca Mountain was a suitable site for a nuclear waste repository. After TRW entered into a subcontract with Winston, there was considerable openness of communication between TRW, Winston, and the Department. TRW often provided the Department with copies of documents concerning the regulatory process that were submitted by Winston, and Winston directly provided the Department with its NRC licensing work relied upon by the Department. Second, although not expressly referring to the Yucca Mountain contract as a "follow-on" contract, the Department rejected LeBoeuf's protest of the award to Winston because it "considered the procurement as a replacement for the TRW [S]ubcontract," and the statement of work was substantially similar to the statement of work under the TRW Subcontract. Similarly, GAO rejected LeBoeuf's bid protest because, in essence, Winston's work under its TRW subcontract was "virtually indistinguishable" from the work it was doing under the challenged contract with the Department. On appeal, the Department thus maintains that "Winston was bidding to perform essentially the same work that it performed for [the Department] while a subcontractor for TRW . . . ." Appellee's Brief at 46.

The Department's position misses the mark, however. The Department knew or should have known that awarding the Yucca Mountain contract to Winston created an apparent conflict of interests for Winston that required further scrutiny. Whether, as LeBoeuf contends, the Department's position that Winston did not have an apparent conflict of interests is implausible depends on the resolution of factual issues that are unclear from the record. The first issue relates to whether, as LeBoeuf asserts, TRW's interests were "virtually certain to be adverse to [the Department's]," Appellant's Brief at 10, such that Winston could not loyally serve the Department's interests without adversely affecting TRW's interests. The second issue concerns whether in awarding the Yucca Mountain Contract to Winston and in structuring Winston's scope of work to avoid a conflict of interests, the Department jeopardized the licensing process for the Yucca Mountain Project. This risk emanated from the fact that the NRC could disqualify the Department's expert law firm for having a conflict of interests that precluded it from providing the requisite quality assurance review to assure that the license application was technically and legally correct.

LeBoeuf contends that, under the Yucca Mountain contract, Winston would be forced to review its previous work for TRW relating to the Yucca Mountain Project licensing application, which would in turn place the validity of the licensing process in issue. The Department denies this is so, maintaining that the statement of work for Winston's contract with the Department made no mention of such review. The Revised Management Plan designated the OGC, which lacked NRC expertise, as the entity that would provide "concurrence review" before the application was filed with the NRC, not Winston, the expert law firm. On this basis, GAO rejected LeBoeuf's conflicts argument, reasoning that the Department would ultimately be responsible for the review of the license application, and that the RFP did not contemplate that the contractor, Winston, would conduct the review functions. This was, in GAO's opinion, a workable solution because the license application, on which Winston would work, would not be the original source of any technical conclusions subject to

NRC quality assurance review. GAO did not reach Le-Boeuf's arguments alleging violation of the professional canons of ethics and rules of professional responsibility, for lack of jurisdiction.

Although GAO's interpretation of contract matters is an expert opinion to be "prudently consider[ed]" by the court, *Delta Systems*, 744 F.2d at 201, "the court has no obligation to defer to it." *Id*. On review of the grant of summary judgment, we conclude that there is reason not to do so. LeBoeuf submitted an affidavit in the district court of Howard K. Shapar, who had served as the NRC's Executive Legal Director from 1976–1982, and before that as Assistant General Counsel for Licensing and Regulation. Mr. Shaper identified a problem created by the Department's effort to eliminate a conflict for Winston. Mr. Shapar stated that "the artificial and curious limitations on Winston's scope of work . . . [will] have a clearly adverse effect on the successful and timely licensing of the project." Specifically, he found that the Department's position that the license application for Yucca Mountain Project "will not itself be subject to the [quality assurance ("QA")] process," and that the Department "does not plan to have a QA review of the License Application," was "truly astonishing and constitutes a grave mistake that may result in the Yucca Mountain project being unlicensable." Based on his experience, "the license application itself . . . routinely has received the very highest level of quality assurance review. To abandon this requirement is a prescription for failure, and would by any measure be sharply contrary to NRC practice and sound public policy." In his view, the Department's statement that Winston would not be part of the final Department concurrence review, part of any quality assurance review, or part of the team drafting the license application is contrary to the "Scope of Work" set forth in Section C.2 of the 1999 RFP, which reflected the necessary scope of work, consistent with NRC practice, in which the licensing attorneys are "intimately involved in review of the application prior to filing it."

The Department nonetheless maintains that Winston was properly granted the 1999 contract because the technical

advisory committee and the contracting officer documented that Winston's work under the TRW Subcontract would not create a conflict of interests. Although the HCA's Protest Decision of July 30, 1999 makes clear the Department's concern about potential conflicts, the reviews by the committee and the contracting officer were based on the information provided by Winston and do not discuss whether TRW's interests would or could diverge from those of the Department, much less a way to mitigate Winston's apparent conflict of interests, as required by *FAR* § 9.504(a)(2). The Department was aware of the terms of the TRW Subcontract and TRW was, as LeBoeuf points out, a "readily available source" of information about its contractual relationship with Winston. LeBoeuf maintains that if the contracting officer had fulfilled his duties under *DEAR*, he would have discovered a cover letter from TRW to potential bidders on the 1992 RFP, stating that the winning bidder "was to work 'exclusively' for TRW . . . and do nothing that would potentially or actually conflict with TRW's interests." Appellant's Brief at 14 (quoting the 1992 cover letter that TRW sent to potential bidders). The Department responds that the 1992 letter was not part of the TRW Subcontract or the administrative record. It maintains, however, that even if the letter could be read into the TRW Subcontract, there was still no basis to disqualify Winston for a conflict of interests, relying mainly on the Department's determination that Winston did not have an OCI and its position, with which the district court agreed, that the contract for legal services referenced in the 1992 letter was not the procurement at issue.

But given the evidence of Winston's apparent conflict of interests arising from the terms of the TRW Subcontract and the 1999 RFP, the Department's decision to follow the standard OCI format by accepting Winston's no-conflict statement at face value is inconsistent with federal and Department OCI requirements. The terms of Winston's obligations under the TRW Subcontract are relevant under the OCI requirements of the 1999 RFP. Moreover, Winston was a large business concern, yet its no-conflicts statement did not disclose other relevant interests, such as its representation of

the Nuclear Energy Institute identified in the Inspector General's November 2001 report. LeBoeuf presented evidence that Winston's apparent conflict of interests could not be satisfactorily mitigated without jeopardizing the success of the Yucca Mountain Project NRC licensing application. While the Department may be able to demonstrate through supplementation of the administrative record or other means that it appropriately addressed Winston's apparent conflict of interests and reached a reasonable decision in awarding the Yucca Mountain contract to Winston and in revising the Management Plan for development of the application to limit Winston's work, the adequacy of the OCI evaluation remains to be demonstrated. A failure to conduct an adequate evaluation appears harmless to neither the Department's nor LeBoeuf's interests. *See Delta Systems*, 774 F.2d at 203.

Accordingly, because LeBoeuf raised a material issue of disputed fact regarding the adequacy of the Department's regulatory compliance, summary judgment to the Department was inappropriate, *see Liberatore v. Melville Corp.*, 168 F.3d 1326 (D.C. Cir. 1999); *Barrer v. Women's Nat'l Bank*, 761 F.2d 752 (D.C. Cir. 1985); Fed. R. Civ. P. 56(c), and we vacate the judgment and remand the case to the district court to determine the adequacy of the Department's compliance with *FAR* and *DEAR* regulations.

On remand the district court also shall address LeBoeuf's contention that awarding the Yucca Mountain contract to Winston violated Nevada's Code of Professional Responsibility. The district court declined to reach LeBoeuf's arguments based on Winston's alleged violation of the Code of Professional Responsibility on the ground that the ethical rules did not fall within *FAR*'s reference to "applicable laws and regulations," which it interpreted as referring only to federal regulations. LeBoeuf maintains that the rules were incorporated in the 1999 RFP by the requirement that lawyers assigned to the Yucca Mountain Project be members in good standing of at least one State bar. The HCA's Protest Decision of July 30, 1999 indicates that the Department also viewed the rules of professional responsibility to be relevant to its determination about actual and apparent conflicts of

interests under the 1999 RFP. The HCA applied legal ethics rules, namely, Rule 1.79(c) of the D.C. Rules of Professional Conduct, to conclude that even if a law firm's conflict of interests could be waived, it was not an adequate solution; the waiver had to come from all affected clients and, thus, the waiver would not be within the Department's control. The HCA advised that Department "program officials [were] not willing to risk that any waiver of conflicts . . . was ineffective." HCA Protest Decision, July 30, 1999, at 5. The Department's interpretation, through the HCA, that ethical rules are relevant to the resolution of conflict-of-interests under the 1999 RFP, *cf. Rosen v. NLRB*, 735 F.2d 564, 574–75 (D.C. Cir. 1984), thus distinguishes *Leslie Miller v. State of Arkansas*, 352 U.S. 187, 190 (1956) (per curiam), and *Don't Tear It Down, Inc. v. Penn. Av. Dev. Corp.*, 642 F.2d 527, 534–35 (D.C. Cir. 1980), on which the district court relied in concluding that *FAR*'s reference to "applicable laws and regulations" did not encompass state rules of professional responsibility. *Cf. Pfizer, Inc. v. Heckler*, 735 F.2d 1502, 1507 (D.C. Cir. 1984).

**B.**

The Department's continuing need for NRC expert legal services was confirmed by the Secretary's April 30, 2003 letter to the Speaker of the U.S. House of Representatives, of which we take judicial notice as the Department requests. *See Joseph v. U.S. Civil Serv. Comm'n et al.*, 554 F.2d 1140, 1148 (D.C. Cir. 1977); *Bebchick et al. v. Wash. Metro. Area Transit Comm'n*, 485 F.2d 858, 880 (D.C. Cir. 1973). Events have overtaken LeBoeuf's litigation to the extent that the Department terminated the Yucca Mountain contract with Winston in November 2001 and, according to its April 30, 2003 letter to the Speaker, is seeking to hire an expert law firm for the Yucca Mountain Project. However, LeBoeuf's request for a direct award or other relief is not moot if the court can effectuate "*some* form of meaningful relief" were LeBoeuf to prevail on the merits of its disqualifying conflict claim. *See Church of Scientology of Ca. v. United States*, 506 U.S. 9, 12 (1992).

In *Delta Systems*, 744 F.2d at 204, the court explained that:

16

> the main objective of our effort at framing a remedy is to assure that the government obtains the most advantageous contracts by complying with the procedures which Congress and applicable regulations have provided. Putting the disappointed bidder in the economic position it would have occupied but for the error is normally the best approach to this result. Where that is impracticable, however, or can only be achieved at a cost to the government that will greatly exceed the benefits derived from requiring observance of the proper procedures in the particular case, we must seek a more reasonable alternative.

*Delta Systems*, 744 F.2d at 206–07. The 1999 RFP contemplated a ten-year performance period, and the Department's contract with Winston was terminated after only two years. If the district court on remand finds that the expert legal services being sought by the Department are substantially similar to those described in the 1999 RFP, then the court must determine whether a direct award would be appropriate. *Cf. Hamilton Stores, Inc. v. Hodel*, 925 F.2d 1272, 1281–82 (10th Cir. 1991). The Department's claim that a direct award to LeBoeuf would be "unwieldly and peculiar," Appellee's Br. at 27, may be explored on remand. Although considerable time has passed, alternative relief may be appropriate, such as that suggested in *Delta Systems*, 744 F.2d at 198, namely, affording LeBoeuf the right to require the Department to make a *nunc pro tunc* reselection of the contractor under any new RFP. Or, if the district court finds that LeBoeuf has preserved its bid-preparation claim, an issue the district court left open, LeBoeuf may, if it desires, recover its bid-preparation costs, provided that the amount is within the jurisdictional limit. *See id.*; 28 U.S.C. § 1346 (1982). *See generally, PRC Inc. v. Widnall*, 64 F.3d 644 (Fed. Cir. 1995). *Delta Systems*, 744 F.2d at 204 (citations omitted); *see also Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C. Cir. 1970).

Accordingly, we vacate the judgment to the Department and remand the case to the district court to determine the adequacy of the Department's evaluation of Winston's appar-

ent conflict of interest, and, if LeBoeuf prevails, the nature of appropriate relief to LeBoeuf in light of the Department's need for expert legal services on the Yucca Mountain Project.