# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 7, 2017            Decided July 7, 2017

No. 16-5080

NATIONAL MALL TOURS OF WASHINGTON, INC.,
APPELLANT

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00529)

*Kevin R. Garden* argued the cause and filed the briefs for appellant.

*Brian J. Field*, Assistant U.S. Attorney, argued the cause for federal appellees. With him on the briefs were *R. Craig Lawrence* and *Alexander D. Shoaibi*, Assistant U.S. Attorneys.

*Frank S. Swain* argued the cause and filed the brief for appellee City Sightseeing Washington D.C., Inc.

Before: TATEL and WILKINS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  Appellant National Mall Tours of Washington, Inc. ("National Mall Tours") competed with City Sightseeing Washington D.C., Inc., doing business as "Big Bus Tours," for a highly coveted 10-year concession contract with the Park Service that would allow it to provide guided tours on the National Mall.  Big Bus Tours won the contract.  National Mall Tours sued the U.S. Department of Interior, Secretary Sally Jewell, the National Park Service, and Director of Park Service Jonathan Jarvis (collectively, the "Park Service") in the District Court under the Administrative Procedure Act and the National Park Service Concessions Management Improvement Act of 1998, 54 U.S.C. § 101911 *et seq.* ("Concessions Act").  National Mall Tours challenged the agency's decision to proceed with the award of the contract to Big Bus Tours despite the fact that Big Bus Tours underwent a change of ownership midway through the award process.  National Mall Tours also challenged the agency's failure to notify two congressional committees of the proposed concession contract between the Park Service and Big Bus Tours, as allegedly required by the Concessions Act.  The parties submitted cross-motions for summary judgment.  The District Court ruled in favor of the Park Service and dismissed the action.  This appeal followed.

**I.**

We begin by examining the legal framework governing awards of concession contracts and then turn to what happened in this case.

3

**A.**

The 1998 Concessions Act and accompanying Park Service regulations govern the competitive process by which the agency solicits proposals and awards concession contracts for visitor services on the National Mall. Generally, the Park Service issues a prospectus, bidders (known as "offerors") respond by submitting proposals, and the Park Service then selects the winning proposal. The Concessions Act provides certain minimum standards the Park Service should follow along the way and affords the agency discretion to determine whether those standards are met.

The Concessions Act instructs the Park Service to select the offeror with the "best proposal, as determined by the Secretary through a competitive selection process," 54 U.S.C. § 101913(1), with reference to various criteria including statutorily enumerated Principal Selection Factors, *id.* §§ 101913(1), (5)(A); *see* 36 C.F.R. § 51.16. For example, Principal Selection Factor 3 considers the "experience and related background" of the offeror, and Principal Selection Factor 4 considers "the financial capability" of the offeror to carry out its proposal. 54 U.S.C. § 101913(5)(A)(ii)-(iii). The Park Service must take these and other factors into account when determining which offeror has the "best" proposal. *Id.* § 101913(5)(A). The Concessions Act also provides certain grounds for which the Park Service "shall reject," or not even "consider[]" proposals, when the Park Service "determine[s]" that an offeror fails to meet certain standards. *Id.* § 101913(4)(A)-(B).

Relevant here, Park Service regulations provide that the agency will reject a proposal when it "determin[es]" the proposal is not "responsive." 36 C.F.R. § 51.18. A "responsive proposal" is one that the Park Service has

"determined" "provide[s] the information required by the prospectus," among other things. *Id.* § 51.3. This does not mean a proposal lacking any requisite minutiae will necessarily be rejected. Rather, the agency approaches missing information with a view toward its materiality – that is, the information that it considers to be "required by the Prospectus" is that which is both "expressly required by the Prospectus and . . . *material, as determined by the Service*, to an effective evaluation of the proposal under the applicable selection factor." Prospectus, J.A. 311 (emphasis added). Importantly, once proposals are submitted, offerors are generally prohibited from amending or supplementing their proposals. *See* 36 C.F.R. § 51.15(a). Thus, omissions can be fatal if the Park Service deems them material.

**B.**

In October 2014, the Park Service issued a Prospectus soliciting proposals for a 10-year concession contract on the National Mall. The Prospectus called for all proposals to be submitted by December 12, 2014. At the time, Big Bus Tours served as a temporary concessioner with its contract set to expire on March 31, 2015.

Three companies supplied proposals for the contract – Big Bus Tours, City Sights D.C., and National Mall Tours. The Park Service's Evaluation Panel reviewed all three proposals, scored them, and ultimately recommended that the agency select Big Bus Tours to be the concessioner on the new contract. Park Service management approved the recommendation, agreeing Big Bus Tours had the best proposal. On March 15, 2015, the agency informed each bidder of its decision and sent Big Bus Tours a copy of the proposed contract for its signature.

On March 19, after learning it would lose the bid, National Mall Tours interjected with an email to a Park Service manager: "Are you aware that Big Bus was sold in February of this year? Do you know who you are dealing with at this point?" The email alluded to the recent acquisition by Exponent Private Equity Partners III LP of 60% of the outstanding equity of Big Bus Tours Ltd. ("Big Bus UK"), which was the United Kingdom-based parent company of Big Bus Tours' own parent company (the "Exponent Transaction").[1]

Four days later, on March 23, the Park Service carried on with the award process and sent a letter to Big Bus Tours reiterating the agency's "intent to award" it the contract. J.A. 1406. On March 26, National Mall Tours interjected again, this time with a letter from its counsel to the Park Service outlining Big Bus Tours' recent change in ownership and insisting that its proposal was now invalid. The letter did not distinguish between Big Bus Tours and Big Bus UK, leaving the impression that Big Bus Tours was directly purchased by Exponent by variously stating: Big Bus Tours was "acquired by a new foreign company" and Exponent "took over control of Big Bus Tours." J.A. 1412-13. Because offerors are prohibited from amending their proposals after submission, National Mall Tours asserted that the Park Service "is legally precluded from proceeding with any award of the contract" to Big Bus Tours "given that critical information related to the evaluation of Big Bus Tours has changed since proposals were submitted." J.A. 1413-14. Thus, National Mall Tours requested that the Park Service "voluntarily rescind" its

---

[1] At all relevant times, Big Bus Tours (D.C.) was 100% owned by Open Top Sightseeing USA (D.C.), which was in turn 100% owned by Big Bus UK.

decision to award the contract to Big Bus Tours or else face National Mall Tours in court. J.A. 1414.

A flurry of emails among Park Service managers ensued, raising concerns that Big Bus Tours' proposal might have depended on funding that no longer exists. They determined it was necessary to request information from Big Bus Tours about the Exponent Transaction. On March 27, the Park Service emailed Big Bus Tours, "request[ing]" that it "resubmit" its responses to Principal Selection Factors 3 and 4 to reflect "the new ownership information." J.A. 1455. Those selection factors concerned the organizational structure and financial ability of the offeror, respectively. The Park Service also requested that Big Bus Tours "provide a narrative or a revised proposal signifying all the references of the previous ownership replaced by the new ownership." J.A. 1455.

Big Bus Tours responded the following day with a two-page letter (the "March 28 Letter"), advising the agency of various things that remained "unchanged" as a result of the Exponent Transaction, implying it did not need to supplement or revise its proposal. It explained that Exponent's "investment" in Big Bus Tours' "London Company . . . in no way affects the tender submitted with no change in control or ownership structure of our US operations." J.A. 1456. Big Bus Tours also asserted that the "change has no [e]ffect" on its responses to Principal Selection Factors 3 or 4. J.A. 1456. With respect to the corporate ownership information required by Principal Selection Factor 3, Big Bus Tours said that its "corporate structure . . . remains unchanged," though it acknowledged that Big Bus Tours' grandparent (Big Bus UK) was now "beneficially owned" by Exponent. J.A. 1456-57. As for Principal Selection Factor 4, Big Bus Tours explained that Exponent's investment would result in no change in its financial capacity as outlined in the proposal and specifically

there was "no change to Investment, Income and Cash Flow schedules as originally supplied in the [Principal Selection Factor 4] Excel Forms." J.A. 1457.

On March 30, Park Service managers conferred over email and determined to proceed with the award to Big Bus Tours, signing the contract that same day. J.A. 1515-16.

National Mall Tours filed a lawsuit in the District Court, challenging the Park Service's award decision. Big Bus Tours joined the proceeding as an Intervenor-Defendant. The parties filed their respective motions for summary judgment on the administrative record. The District Court denied National Mall Tours' motion for summary judgment and granted summary judgment to the Park Service. This appeal followed.

National Mall Tours' chief contention is that the Exponent Transaction affected Big Bus Tours' proposal in a material way such that the Park Service lacked a rational basis for awarding the contract to Big Bus Tours once it learned about the change in ownership. It also argues that the Park Service flouted its statutory obligation to submit the proposed concession contract to certain congressional committees prior to finalizing the award.

## II.

We review a district court's grant of summary judgment *de novo*. *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079, 1082 (D.C. Cir. 2015). "[B]ecause we review the district court's judgment, not its reasoning, we may affirm on any ground properly raised." *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009) (quoting *EEOC v. Aramark Corp.*, 208 F.3d 266, 268 (D.C. Cir. 2000)).

We review the agency's decision under the standard of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). In the context of reviewing agency contract decisions, our "role . . . is limited to determining whether the agency acted in accord with applicable statutes and regulations and had a rational basis for its decisions." *LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003) (quoting *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984)). In this limited capacity, we must refrain from "imposing [our] own views of proper procedures" upon the Park Service and "improperly intrud[ing] into [its] decisionmaking process." *Id.* (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 525 (1978)). National Mall Tours is similarly constrained. As a "disappointed bidder" challenging the agency's decision to award the contract to its competitor, National Mall Tours "must show either that the agency's decision lacked a rational basis or that the 'procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

## III.

National Mall Tours' first claim is that the responses provided by Big Bus Tours in its proposal were "no longer accurate or reliable" after the Exponent Transaction, and the Park Service's decision to proceed with the award in spite of that necessarily "lacked a rational basis and was arbitrary, capricious, and an abuse of discretion." Appellant Br. 42.

We consider National Mall Tours' theory against the following backdrop. First, the Park Service has considerable discretion to select and reject proposals under the Concessions Act. According to its own procedures, the Park Service must

reject a proposal when it determines that the offeror omitted material information (rendering the proposal non-"responsive"), with materiality being ascertained by the Park Service. *See* 36 C.F.R. §§ 51.18, 51.3; J.A. 311. National Mall Tours does not dispute that Big Bus Tours' original proposal was accurate and fully "responsive" to the Prospectus requirements at the time of its submission, 36 C.F.R. § 51.18, or that the Park Service rightfully decided that Big Bus Tours' proposal was "best" in accordance with the Concessions Act and selected Big Bus Tours to be the concessioner prior to learning about the Exponent Transaction.

National Mall Tours takes issue with the Park Service's continued reliance on the original proposal once the agency became aware of the Exponent Transaction. But there is no regulatory guidance for how the Park Service must proceed if an offeror's ownership changes after a proposal is submitted. Under these circumstances, it was reasonable for the agency to make a limited request of the offeror to ascertain whether the change in ownership impacted its existing proposal. The first issue we consider is whether the response provided by Big Bus Tours in its March 28 Letter constituted an unlawful amendment. The answer will shape the scope of the information the agency could consider in determining whether to proceed with the award to Big Bus Tours.

**A.**

Offerors are generally prohibited from "amend[ing] or supplement[ing]" a proposal following its submission. 36 C.F.R. § 51.15(a). National Mall Tours uses this prohibition to craft an automatic-disqualification rule, arguing the Exponent Transaction created inaccuracies and omissions in the proposal that the Park Service could not rationally ignore but that Big Bus Tours also was not allowed to cure without an unlawful

amendment. Given such a predicament, National Mall Tours suggests the Park Service had no choice but to reject Big Bus Tours' proposal as "invalid," without considering the March 28 Letter. Appellant Br. 12-13. As this Court said of a disappointed bidder's thesis over half a century ago: "This is an extremely ingenious argument but it is in our opinion entirely unsound." *Fulton Iron Co. v. Larson*, 171 F.2d 994, 997 (D.C. Cir. 1948).

We reject the notion that the agency's knowledge of a change in circumstances that might impact an offeror's proposal necessarily invalidates that proposal. Such a straightjacketed approach assumes that any omission rendered after submission is necessarily both material and detrimental to the original proposal. But not every omission is per se material, and even a material omission is not necessarily the death knell National Mall Tours had hoped for. What if the Exponent Transaction materially *improved* Big Bus Tours' candidacy? Or, to offer a more concrete example, suppose the number of buses each offeror had at its disposal was critical to the Park Service; and suppose Big Bus Tours said it had ten buses in its proposal, but it later acquired five more without telling the Park Service. Then, after learning the Park Service selected Big Bus Tours, National Mall Tours wrote the agency an ominous email: "Did you hear the news about Big Bus Tours' buses? Do you even know how many buses it has at this point?" Under National Mall Tours' game of gotcha, the agency's knowledge of a potential change to the proposal in a category of information it deems material renders the proposal invalid and disqualifies the offeror.

Given the Concessions Act's goal of obtaining the best concessioners, and the discretion afforded to the Park Service to evaluate the merits of proposals, we see no basis for *automatic* disqualification when no regulation calls for it.

However, the issue remains whether it was permissible for the Park Service to rely on the March 28 Letter to reach its decision to proceed with the award to Big Bus Tours. Although National Mall Tours asserts that the March 28 Letter constitutes an unlawful amendment, it does not assert any prejudice. For example, National Mall Tours does not claim it should have received a "similar opportunity to amend or supplement" its own proposal, 36 C.F.R. § 51.15(a), or that Big Bus Tours gained an advantage in having an invitation to do so. Indeed, National Mall Tours' complaint is not that the letter supplemented the proposal but rather that it let the proposal be, allowing Big Bus Tours to rest on its pre-existing laurels.

Thus, there is no serious dispute that this case does not involve a "clear and prejudicial" violation of the applicable regulations. *See LeBoeuf*, 347 F.3d at 320. Our review is instead limited to whether the agency's decision to proceed with the award "lacked a rational basis" based on the information provided to it, including the March 28 Letter. *See id.*

**B.**

Because the agency already decided Big Bus Tours had the best proposal, the relevant inquiry is whether the Exponent Transaction should have changed its calculus. In this context, the question is not just whether the Exponent Transaction impacted the proposal, but whether any such impact was material. We think if the Park Service had a rational basis for concluding there was no material change to Big Bus Tours' proposal, then its decision to proceed with the award would also be rational.

So, what changed? National Mall Tours does little to substantiate its sweeping assertion that Big Bus Tours'

proposal became "inaccurate and unreliable" following the Exponent Transaction. The only inaccuracy it identifies in Big Bus Tours' proposal is a statement that no individual or entity owned more than 25% of Big Bus UK, which was no longer true following the Exponent Transaction. That fact was revealed by the March 28 Letter, if not sooner by National Mall Tours' letter two days prior. Thus, National Mall Tours' theory relies primarily on alleged omissions. But the only omission it points to is a disclosure required under an unscored portion of Principal Selection Factor 3.[2]

Principal Selection Factor 3 considers the "experience and related background of the Offeror, including the past performance and expertise of the Offeror in providing the same or similar visitor services as those to be provided under the concession contract." J.A. 324. Under that selection factor, the offeror must provide information about its organizational structure that is "not . . . scored for selection purposes" but is used "[t]o assist in the evaluation of proposals under this and other selection factors." J.A. 324. Relevant here, the offeror must identify "all levels of parent organizations," and "any individual or business entity that holds or will hold a *controlling interest* in the Offeror."[3] J.A. 324 (emphasis

---

[2] In the District Court, National Mall Tours claimed other parts of the proposal were impacted by the Transaction, including responses to Principal Selection Factor 4, which considers "the financial capability of the offeror to carry out its proposal," J.A. 329, and certifications pertaining to civil and criminal liability. But it does not press those arguments on appeal.

[3] To the extent National Mall Tours is concerned about the possibility of a nefarious offeror being able to postpone an anticipated change in ownership until after submission of its proposal, it appears that circumstance would be covered by the required disclosure of "any individual or business entity that . . . *will hold* a controlling interest in the Offeror." J.A. 324 (emphasis added).

added). National Mall Tours contends Exponent became an entity with a "controlling interest" in Big Bus Tours, not just its grandparent (Big Bus UK), and thus would have triggered a disclosure about Exponent had the Transaction occurred prior to submission. The Park Service disputes that is so, asserting Exponent did not hold a "controlling interest" in Big Bus Tours as that term is defined in the regulations.[4] *See* 36 C.F.R. § 51.84. The parties' briefs are consumed by this question, but we need not decide whether the Park Service's rather confounding interpretation of "controlling interest" is entitled to deference on this point.[5] Even assuming that the Exponent Transaction implicated the disclosure under Principal Selection Factor 3, National Mall Tours fails to show it constituted a material change to the proposal such that it was irrational for the agency to proceed with the award. In the parlance of the APA, it fails to show "prejudicial error." 5 U.S.C. § 706.

The Park Service examined the facts before it regarding the Exponent Transaction, and determined the transaction did not render a material change in Big Bus Tours' proposal. National Mall Tours' only response is that ownership changes

---

[4] "Controlling interest" is defined as "an interest, beneficial or otherwise, of sufficient outstanding voting securities or capital of the concessioner or related entities that permits the exercise of managerial authority over the actions and operations of the concessioner." 36 C.F.R. § 51.84.

[5] The Park Service's primary contention is that the phrase "permits the exercise of managerial authority" means there must be evidence of Exponent's "inten[tion]" to exercise managerial authority over Big Bus Tours. Appellee Br. 14. The District Court agreed. *See Nat'l Mall Tours of Wash., Inc. v. U.S. Dep't of the Interior*, No. 15-0529, 2016 WL 8711706, at *9 (D.D.C. Mar. 18, 2016). We save that question for another day, but note that Black's Law Dictionary (10th ed. 2014) defines "permit" in terms of potentiality, not actuality, *e.g.*, "[t]o give opportunity for" or "[t]o allow."

are categorically material, attempting to override any agency discretion in the matter.  In particular, it points to the fact that Park Service regulations require the agency to pre-approve certain changes in ownership effectuated by existing concessioners, 36 C.F.R. § 51.85(c), and failure to obtain the agency's assent constitutes a material breach of a concession contract, *id.* § 51.88.  But National Mall Tours concedes those regulations do not apply to offerors.  Even if the regulations did apply, under the Park Service's interpretation of the pre-approval regime, the Exponent Transaction would not require its approval.  The Park Service's view is supported by our dicta in *Amfac Resorts, LLC v. Dep't of the Interior*, 282 F.3d 818, 836-38 (D.C. Cir. 2002), *vacated in part on other grounds sub nom. Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003), which suggested that prior approval is only required under 36 C.F.R. § 51.85(c) when the ownership change is effectuated by the concessioner itself, not by a parent or grandparent.  In light of our dicta, the Park Service's interpretation is certainly a "permissible" one. *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1326, 1337 (2013).  In sum, we see nothing categorically material about the ownership change here.

By considering materiality in the abstract, National Mall Tours fails to grapple with the critical question in this case given the posture of the award process: it is not whether ownership information is material, but rather whether the change in ownership rendered a *material change* in Big Bus Tours' proposal.  This is a case-specific inquiry, and National Mall Tours offers no reason to question the Park Service's judgment that the Exponent Transaction did not result in such a change.  Thus, we affirm the District Court's grant of summary judgment as to the Park Service's decision to award the contract to Big Bus Tours.

**IV.**

National Mall Tours' second claim challenges the Park Service's failure to notify certain congressional committees of the proposed concession contract with Big Bus Tours.

The Concessions Act requires the Park Service to "submit" the "proposed concession contract . . . to the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate" if the contract has "anticipated annual gross receipts in excess of $5,000,000 or a duration of more than 10 years." 54 U.S.C. § 101913(6). In such cases, the Park Service "shall not award [the] proposed concession contract . . . until at least 60 days subsequent to the notification" of these congressional committees. *Id.* National Mall Tours claims the Park Service should have submitted the contract to these congressional committees because it had anticipated gross receipts exceeding $5 million. The Park Service responds that National Mall Tours lacks standing to assert this claim and that, in any event, notification was not required because it reasonably relied on estimates suggesting the $5 million threshold would not be crossed. In considering whether National Mall Tours has standing, we assume it would succeed on the merits, *i.e.*, that these congressional committees should have been notified. *See City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003).

To demonstrate Article III standing, a plaintiff must "establish, as an 'irreducible constitutional minimum,' that they face 'injury in fact' caused by the challenged conduct and redressable through relief sought from the court." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1285 (D.C. Cir. 2016). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Scenic Am., Inc. v. U.S. Dep't of*

*Transportation*, 836 F.3d 42, 48 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). On summary judgment, "the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts" that "at least raise a disputed issue of fact as to each element of standing." *Id.* at 48-49 (citation and alterations omitted).

National Mall Tours claims its injury was being deprived of "a legally valid procurement process," which it asserts was caused by the Park Service's failure to submit the concession contract to these two congressional committees 60 days prior to finalizing the award to Big Bus Tours. Appellant Br. 49. We have previously recognized that a "disappointed bidder" has the right to "a legally valid procurement process," the deprivation of which constitutes a cognizable injury. *Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 3 (D.C. Cir. 2009) (citation omitted); *see also U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 232 (D.C. Cir. 2000); *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1358 (D.C. Cir. 1996). An injury to "a bidder's right to a fair procurement is obviously an injury both traceable to the alleged illegality in a procurement and redressable by any remedy that eliminates the alleged illegality." *Nat'l Mar. Union of Am. v. Commander, Military Sealift Command*, 824 F.2d 1228, 1237-38 (D.C. Cir. 1987). As such, the bidder "need not show that it would be successful" in a new round of procurement, "but only that it was able and ready to bid and that the decision of the [agency] prevented it from doing so on an equal basis." *Alvin Lou Media*, 571 F.3d at 6 (quoting *High Plains Wireless LP v. FCC*, 276 F.3d 599, 605 (D.C. Cir. 2002)).

National Mall Tours is surely disappointed, but for purposes of this claim, it does not substantiate its assertion that it was harmed by an unlawful procurement process. National

Mall Tours acknowledges that submission of the contract to the committees was not required until *after* the agency made its award decision and the competitive process was effectively over. It is not self-evident that a bidder with a stake in the award process would be injured by the agency's failure to inform congressional committees of its final award decision; and National Mall Tours does not advance its own theory except to point to the fact that notification was a requisite "last step" in the award process. Appellant Br. 54. Yet National Mall Tours appears to concede this last step implicates interests entirely distinct from the competitive award process, acknowledging that the "deficiency" it complains of "does not require the agency to undo anything it has done or require changes to any proposals or a new evaluation by the agency." *Id.* In other words, it asserts no flaw in the process by which the agency reached its final award decision. Rather than ask to undo the award or give it another opportunity to bid, National Mall Tours "merely" seeks to have the final, ongoing concession contract submitted to two congressional committees. *Id.*

The disconnect between National Mall Tours' theory of standing and that of the ordinary disappointed bidder is further highlighted when we consider causation. Our procedural injury cases are instructive. In such cases, where a plaintiff challenges an agency's failure to effectuate a required procedure, the plaintiff must show "it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (en banc); *accord WildEarth Guardians v. Jewell*, 738 F.3d 298, 305-07 (D.C. Cir. 2013). Among other things, that means showing a connection between "the omitted procedure and some substantive government decision that may have been wrongly decided because of the lack of the procedure." *City of Waukesha*, 320 F.3d at 234

(internal quotation marks and alterations omitted) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668). Here, however, National Mall Tours asserts no connection between the agency's failure to notify the two congressional committees and its substantive decision to award the contract to Big Bus Tours. Thus, even if the agency should have notified the congressional committees as part of the award process, National Mall Tours has not shown how that failure caused it any cognizable injury. *Cf. DIRECTV, Inc. v. FCC*, 110 F.3d 816, 830 (D.C. Cir. 1997) (disappointed bidder failed to show agency's decision to allow cable industry to participate in auction caused it any injury where only one cable company participated in the auction and that company was not the highest bidder). In sum, National Mall Tours fails to demonstrate it has standing to bring this claim.

**V.**

For the foregoing reasons, we affirm the District Court's grant of summary judgment to the Park Service regarding the agency's decision to award the contract to Big Bus Tours.

Because we hold National Mall Tours lacks standing to bring its claim regarding submission of the contract to certain congressional committees, the District Court lacked jurisdiction to hear it. Thus, we vacate the portions of the District Court's order addressing that claim and remand the case with instructions to dismiss it for lack of jurisdiction. *See Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1207 (D.C. Cir. 2013); *Nader v. Fed. Election Comm'n*, 725 F.3d 226, 230 (D.C. Cir. 2013).

*So ordered.*